**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-------------------------------------------------------x
**UNITED STATES OF AMERICA**      **:**
     **:**
     **:**
           **V.**      **:**      **CASE NO. 3:06CR00004 (RNC)**
     **:**
     **:**
**I-CHE LAI**      **:**      **JUNE 14, 2007**
-------------------------------------------------------x

**SENTENCING MEMORANDUM OF I-CHE LAI**

        This Sentencing Memorandum is respectfully submitted on behalf of I-Che Lai, aged 27, who is scheduled to be sentenced on Monday, June 18, 2007 at 1:00 p.m.  Mr. Lai waived indictment and entered into a plea and cooperation agreement with the Government in early January of 2006.  Mr. Lai has fully accepted responsibility, and feels deep remorse and embarrassment, for his criminal offense.  Since April of 2004, Mr. Lai has done all in his power to cooperate fully with the Government in the investigation and prosecution of others, and to create something positive out of his life.  As is discussed more fully below, we trust and hope that the Court will recognize that Mr. Lai, despite his commission of the offense in this matter, is a fundamentally good, decent person who has great potential to continue to be a constructive and contributing member of society.  For the reasons set forth below, we respectfully request that the Court impose a sentence of probation in this matter.  We respectfully submit that such a sentence, under the totality of the circumstances, would be a sentence sufficient, but not greater than necessary, to achieve just punishment in this instance.

## I.     PROCEDURAL BACKGROUND

On January 6, 2006, I-Che Lai appeared before the Court, waived indictment, and formally entered into a plea agreement and cooperation agreement with the Government.  Under that agreement, Mr. Lai pleaded guilty to a one-count Information charging a conspiracy to commit Criminal Copyright Infringement in violation of 18 USC Section 371.

The waiver of indictment and guilty plea of Mr. Lai in January of 2006 was the culmination of a process that began when Mr. Lai was a young undergraduate student at Washington University in St. Louis, Missouri.  As a college student, Mr. Lai was drawn into what has been called the "warez scene," an on-line community where pirated software, music and movies were available for free and where I-Che developed "friends" and was appreciated for his computer knowledge and skill.  By the time of his graduation from Washington University in December of 2003, Mr. Lai's participation in the warez scene had significantly dissipated.  Thereafter, until a search warrant was executed in April of 2004, Mr. Lai stayed in contact with some friends he had from the warez scene, but was not participating as he had been while a college student.

Shortly thereafter, while represented by previous counsel,[1] Mr. Lai began the process of doing all he could to make amends for his criminal conduct.  By June of 2004, Mr. Lai was interviewed at the Department of Justice in Washington by a Senior Counsel in the Computer Crimes and Intellectual Property Section, by two Assistant United States Attorneys from the District of Connecticut, and agents of the Federal Bureau of Investigation.  A few months before the actual guilty plea in Hartford, both undersigned counsel and Mr. Lai had signed a plea agreement dated October 28, 2005.  Again before the actual guilty plea, in response to a request

---

[1]  John H. Young, Esq., of Sandler, Reiff & Young, PC, 50 E Street, SE, Washington, D.C.

of DOJ counsel in December 2005, and consistent with and in furtherance of his desire to provide as much assistance to the Government as possible, Mr. Lai provided information to the Government to assist them in their efforts in the investigation and prosecution of others.  Because of logistical constraints, Mr. Lai provided this assistance to the Government though undersigned counsel, rather than through an in-person debriefing.

Mr. Lai's plea agreement and cooperation agreement were formally entered into in Hartford on the date of his guilty plea in January of 2006.  Immediately thereafter, Mr. Lai was again debriefed in Hartford by the FBI and an AUSA in an effort to provide further assistance to the Government investigation of others.  In subsequent discussions with an AUSA, Mr. Lai offered, through the undersigned counsel, to assist in any way possible, including participating in a publicity campaign regarding internet piracy.[2]  Later, in March of 2006, in further effort to provide assistance of the government, Mr. Lai traveled from Wisconsin to New Haven to be debriefed by the FBI and an AUSA to further the government's investigation against others.  Thereafter, Mr. Lai has continued to offer his further assistance and cooperation with the Government and remains ready, willing and able to provide any such assistance in the future.[3]

---

[2]  There has been some change in personnel in this matter in both prosecutors and in investigative agents.  Many of the discussions with respect to I-Che's cooperation and his further potential cooperation were with AUSA Maria Kahn, now a Connecticut Superior Court Judge.

[3]  On June 8, 2007, AUSA Chang informed counsel that there did not appear to be an opportunity in the near term for Mr. Lai to provide further cooperation in the investigation and prosecution of others.  Previously, AUSA Chang and counsel had discussed seeking to postpone the sentencing if there was such a near-term opportunity.  On June 8, AUSA Chang also confirmed that, based on the cooperation to date, under all of the circumstances, a 5K1.1 motion would not be filed.  AUSA Chang requested that Mr. Lai's sentencing proceed on June 18, and thereafter that Mr. Lai be willing to continue to provide cooperation to the Government in the future.  Mr. Lai will continue to be available to so assist the government.  Because it was not until June 8 that counsel learned that there was no further near-term cooperation that would justify postponement, this Memorandum is filed less than 10 days prior to sentencing.

**II.     Factors To Be Considered In Imposing A "Reasonable" And "Individualized" Sentence Pursuant To 18 U.S.C. § 3553(a)**

Title 18, United States Code § 3553(a) provides the framework within which a sentencing judge must determine the appropriate sentence for a defendant:

> Factors to be considered in imposing sentence. The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:
>
>> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>> (2) the need for the sentence imposed —
>>> A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>> B. to afford adequate deterrence to criminal conduct;
>>> C. to protect the public from further crimes of the defendant; and
>>> D. to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner;
>> (3) the kinds of sentence available;
>> (4) the kinds of sentence and the sentencing range established for
>>> A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines
>> (5) any pertinent policy statement
>>> A. issued by the Sentencing Commission .. .
>> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and found guilty of similar conduct; and
>> (7) the need to provide restitution to any victims of the offense.

The Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), rendered the sentencing guidelines advisory, rather than mandatory.  Although a sentencing court must still consider the guideline range, but it also must consider the other

factors enumerated under § 3553(a) when imposing a sentence.  See United States v. Canova, 485 F.3d 674 (2d Cir. 2007).  While the federal sentencing statute "requires a sentencing court to consider Guidelines ranges, ... it permits the court to tailor the sentence in light of other statutory concerns as well...."  Booker, 125 S. Ct. at 757.  Thus, a sentencing court must now undertake a more refined and particularized analysis, in order to "impose a sentence sufficient, not greater than necessary, to comply with the purposes" of imposing sentence as they are described in § 3553(a).

Following Booker, the Second Circuit in Crosby confirmed that the application of the sentencing guidelines was only one of seven factors that a sentencing court must now consider. United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  As the Second Circuit explained:

> [S]entencing judges remain under a duty with respect to the Guidelines – not the previously imposed duty to apply the Guidelines, but the continuing duty to `consider' them, along with the other factors listed in section 3553 (a). We have every confidence that the judges in this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities *while now achieving somewhat more individualized justice. In short, there need be no fear of judging.* '

Crosby, 397 F.3d at 111-12 (emphasis added); see also United States v. Canova, 412 F.3d 331, 350-51 (2d Cir. 2005) (prior to Booker, sentencing courts "understandably gave predominant, indeed controlling, weight to two factors in § 3553(a): the sentencing range established by the federal Sentencing Guidelines ... and the pertinent policy statements of the Sentencing Commission;" post-Booker a court must consider all of the factors in § 3553(a)); United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006) ("Pursuant to [Booker's] … " remedy opinion," the now-advisory Guidelines are to be considered, together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences.").

Thus, while a sentencing court must consider the applicable Guidelines sentence, there is no presumption that a sentence within the advisory guideline range satisfies all the objectives of § 3553(a). Indeed, the Second Circuit in <u>Fernandez</u> specifically declined "to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable." <u>Fernandez</u>, 443 F.3d at 27. In this regard, the <u>Fernandez</u> Court cited the Third Circuit in <u>United States v. Cooper</u>, 437 F.3d 324 (3d Cir. 2006), which rejected such a presumption, in part, because "it would effectively restore the mandatory nature of the Guidelines..." <u>Fernandez</u>, 443 F.3d at 27.

In <u>Crosby</u>, the Second Circuit summarized the issues that must be considered by a sentencing judge after <u>Booker</u>:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

<u>Crosby</u>, 397 F.3d at 113.

More recently, the Court in <u>Fernandez</u>, reiterated the broader statutory mandate that followed from <u>Booker</u>: " [A] sentencing judge would commit a **statutory error** in violation of section 3553(a) if the judge failed to 'consider' the applicable Guidelines range (or arguably applicable ranges) **as well as the other factors** listed in section 3553(a)." <u>Fernandez</u>, 443 F.2d at 29 (quoting <u>Crosby</u>) (emphasis added). The <u>Fernandez</u> Court went on to emphasize that:

> [c]onsideration of the § 3553(a) factors is **not a cut-and-dried process of factfinding and calculation**; instead, a district judge must contemplate the interplay among the many facts in the record and the statutory guideposts.

Fernandez, 443 F.2d at 29 (emphasis added).

Thus, post-Booker, the sentencing court is in a very different realm.  As the Second Circuit recently repeated:

> Of course, we have recognized that, after Booker, "**the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves.**"  Jones v. United States, 460 F.3d 191, 194 (2d Cir. 2006).  Accordingly, **district judges are afforded wide latitude to impose non-Guidelines sentences based on case-specific applications of the § 3553(a) factors.**

United States v. Cavera, ___ F.3d ___, 2007 WL 1628799 (2d Cir. June 6, 2007) (emphasis added).  Thus, a sentencing court may disagree, in an individual case and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and supported by reasons tied to the § 3553(a) factors based primarily upon the individual circumstances of a particular case.  See United States v. Rattoballi, 452 F.3d 127, 133 (indicating greater appellate scrutiny for "non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant").

As the Court in Rattoballi stated, "Booker worked a fundamental change in federal sentencing:"

> No longer are the Sentencing Guidelines mandatory; district courts are now simply under a duty to consider them, along with the other factors set forth in 18 U.S.C. § 3553(a).  At the same time, we have emphasized that Booker did not signal a return to wholly discretionary sentencing. . . . While district courts enjoy discretion following Booker that discretion must be informed by the § 3553(a) factors; . . . .

Rattoballi, 452 F.3d at 132 (citations omitted).  As the Fernandez Court made clear, the evaluation of those § 3553(a) factors, and the "weight to be afforded any given argument made pursuant to one of the § 3553(a) factors," is a matter "firmly committed to the

discretion of the sentencing judge and is beyond our review, as long as the sentence

ultimately imposed is reasonable in light of all the circumstances presented." Fernandez,

443 F.3d at 32.  On appeal, the "reasonableness" review of the sentencing court's

discretion is limited:

> Reasonableness review **does not entail the substitution of our judgment for that of the sentencing judge**. Rather, the standard is **akin to review for abuse of discretion**. See Crosby, 397 F.3d at 114 (comparing reasonableness review to review for abuse of discretion). Thus, when we determine whether a sentence is reasonable, we ought to consider whether the sentencing judge "exceeded the bounds of allowable discretion[,] ... committed an error of law in the course of exercising discretion, or made a clearly erroneous finding of fact." Id. (citations omitted).

Fernandez, 443 F.3d at 27 (emphasis added).

In this case, The Presentence Report has calculated the Total Offense Level under the

Guidelines to be Level 21, and with Mr. Lai having no criminal history, a resulting imprisonment

range of 37 to 46 months.  For the reasons articulated below, it is respectfully submitted that a

departure within "Sentencing Guidelines" factor contained in 3553(a)(4) is warranted, and, in

addition, that a non-Guidelines sentence that does not include incarceration would be reasonable

in this case and satisfy Judge Newman's recognition of imposing "individualized justice,"

Crosby, 397 F.3d at 114, as well the statutory mandate that **"a sentence be sufficient, but not

greater than necessary"** to comply with the purposes of sentencing.

## III. The History And Character of I-Che Lai

I-Che Lai was born in Taipei, Taiwan on June 12, 1980.  I-Che lived with his father Sui-

Tu Lai, his mother Chin-Lien Lai and his two younger brothers, I-Ting and I-Juinn, in a small

town near Taipei.  I-Che's father worked in the telecommunications industry and his mother

worked in the fishing industry.  Because both his father and mother had to work long hours to

make ends meet, I-Che rarely saw them.  I-Che and his two younger brothers spent most of their time with their aunt and uncle, who lived nearby.

While I-Che's father pushed I-Che to excel in school, I-Che was an average boy, achieving only mediocre grades.  I-Che found himself falling behind in the rigorous Taiwanese school system.  When I-Che was 8 years old, his parents had decided to move the family to the United States to Las Vegas, Nevada, to give his family a new start.

Because of the language barrier between American and Taiwanese, and because no one in I-Che's family spoke fluent English, the transition to life in Las Vegas was difficult.  Nevertheless, I-Che's parents had chosen to come to Las Vegas because they understood that there were relatively good job prospects for non-English speaking immigrants.  I-Che's father became a black jack dealer at a casino and his mother took a job as a carousel attendant.  The Lai family moved into a small two-bedroom apartment in a low-income area.

I-Che and his brothers were enrolled in an elementary school, and because of the language barrier, attended English as a Second Language (ESL) classes.  The ESL classes were a curriculum separate and apart from the "mainstream" students.  Because of I-Che's inability to read in English, as well as his inability to speak English, I-Che was required to repeat the first grade.  I-Che's inabilities also caused him to struggle with his studies and also in his efforts to make friends.  During his first year in the United States, I-Che felt that he "was shut out from the outside world."  In I-Che's second year of education in America, he barely passed all of his subjects.  I-Che's father then provided him with extra math lessons every day after school, and one of I-Che's teacher's suggested that I-Che watch educational TV help with his comprehension of English.

Within two years of arriving in Las Vegas, I-Che's parents had saved enough money to move out of the apartment complex and into a house in the suburbs of Las Vegas. It was about that time that I-Che, through his focus on academics with an emphasis on English, became sufficiently fluent and literate in English and was transferred out of his ESL class and into a regular elementary class. Because I-Che had never experienced the life of a regular elementary school student, his teachers did their best to fully integrate him into all aspects of the classroom life. To show his appreciation for their efforts, I-Che continued his extra study sessions at home and began to see a drastic improvement in his grades. I-Che's teachers acknowledged his academic efforts and achievements by inviting him into the school's Gifted and Talented Education (GATE) program, designed to provide students who excelled in school with a more challenging curriculum. I-Che completed his last year of elementary school as a straight-A student – a complete turnaround for someone who had previously received mediocre grades.

In middle school, I-Che continued to excel in academics. He also made an effort to participate in extra-curricular activities, participating in the school orchestra (violinist), the school newspaper (assistant editor), and the school district's mathematic competitions. During his final year at middle school, I-Che realized that his academic interests were in math and science, and applied to and was admitted at the Clark High School's Academy of Math, Science and Applied Technology program.

During the summer between middle school and high school, I-Che developed an interest in computers. With his father's assistance, I-Che obtained an apprenticeship at a local computer store and became proficient in computer repairs and installations. I-Che continued to work for the local computer store on a part-time basis during his first year of high school. Later in high school, I-Che and his brothers started up a company to repair computers in the Asian community

of Las Vegas, as well as providing that community with education on computer technical skills.

In I-Che's second year of high school, I-Che began to focus on a new interest -- speech and debate. Through the high school's speech and debate program, I-Che competed in numerous debate tournaments in the school district, which brought him a measure of success and tremendous enjoyment. During his second year, I-Che also sought out leadership positions so that he could help others receive the same memorable experiences that he had in high school. I-Che was elected as the vice-president of the speech and debate club, debate captain, and executive representative of the student council. During his third year of high school, I-Che's high school and its community became a second home for him. To show his appreciation and gratitude for what he had received from his high school experience, I-Che wanted to give back to the high school and its community. So, I-Che ran for, and was elected, student body president for his final year of high school. During his high school graduation, I-Che realized that he had transformed from a mediocre student into a confident and competent student, a drastic transformation that would not have happened without the guidance and support of all of his teachers. I-Che left high school with the goal of later becoming a teacher as a second career so that he could assist other students to the same transformation.

After graduation from high school, I-Che attended Washington University in St. Louis, Missouri. I-Che entered college with the goal of obtaining two majors: biomedical engineering and electrical engineering, because the advent of genetics and the advancement in electronics fascinated him. Because of the rigorous study schedule associated with these two majors, I-Che neglected the social scenes on campus and eschewed extracurricular activities, with the sole exception of the debate club, an activity that was part of the foundation for I-Che wanting to attend law school.

While I-Che's father had then moved into the real estate business and was paying for I-Che's education, in order to mitigate the high tuition cost, I-Che obtained a job in a field in which he had some experience – computer repair.  I-Che took a job at the Residential Technology Services, which diagnosed and repaired computer problems of the student body at Washington University.

During I-Che's time at Washington University, a student in his dormitory introduced him to the world of the Internet.  More specifically, I-Che was introduced to the Internet Relay Chat (IRC).  At that time, given demand of the course load that I-Che was carrying, his work for the Residential Technology Services, and his lack of time for the social scenes on campus, I-Che became interested in the social aspects of IRC, where I-Che developed friendships with individuals from other countries.  I-Che's new friends on IRC taught him computer programming, administration of Linux (an operating system), and other computing skills (e.g., installation and maintenance of FTP sites).  For I-Che, this was a dramatic experience – he felt as if he had "stepped into a limitless well of knowledge."  Because of the schools high-speed internet access, IRC also provided an easy and fast access to pirated software, music and movies ("warez").  At this point, I-Che started to download warez and share them with other students in his dormitory.  At that point, it was a "fad" for college students to share warez.

By the end of his second year at Washington University, I-Che had come to realize that he wanted a career in patent law.  He had attended a biomedical engineering seminar on engineering designs in the marketplace, and learned that it was difficult to find lawyers capable of describing the nuances of engineering designs in patent applications.  With his diverse engineering background, I-Che believed that this was a challenge that he wanted to undertake – to transform engineering designs to patents.

Notwithstanding this realization, for I-Che, his studies had begun to take a backseat to the warez scene. His online friendships and fascination with the warez scene had a grip on him. As his site administration skills became well known within the on-line community, I-Che received requests to administer various warez sites. His reputation in computers attracted the attention of various warez groups, who provided him with more opportunities to learn about computers and to develop new friendships. The warez scene had become I-Che's social life – a place where he found his "friends" and where he felt part of a community – a community that appreciated his computer skills an applauded him for his knowledge.

At that time, I-Che did not appreciate the detrimental consequences of his activity in the warez scene. He had set forth a restriction on his involvement with the warez scene: He would never allow himself or any of the warez groups he was affiliated with to sell, or make any profit from, warez. At that time, I-Che had naively viewed this kind of participation as essentially harmless and educational entertainment. I-Che had observed that the majority of the college students were sharing and distributing warez with apparent impunity, and he succumbed to the temptation as well.

During his third year of college, I-Che spent more time with the warez scene that he did on his academics -- the gravitational pull of the black hole of warez was having a great effect on I-Che. At this point, I-Che stopped participating in extra-curricular activities altogether to assist his online "friends." In the process, I-Che affiliated himself with various warez groups and developed various computer programs to facilitate administration of the warez groups' sites. Even though I-Che did not know much about his online "friends," he felt at the time that he had developed strong bonds within his affiliated groups based on common interests in computers, electronics, and video games.

In his last year at Washington University, as I-Che began to plan for his future, he began the process of his withdrawal from the warez scene. He decided to apply to law school in order to reach his goal of becoming a patent attorney. He wanted to focus on law school applications, and law school was going to require his undivided attention. I-Che desired a smooth transition to a life without the time-consuming warez scene and he decided to withdraw from the warez scene. However, I-Che found it difficult to make a clean break away from the warez community. Instead, the pull of warez and of his friendships there impacted him. I-Che continued to maintain his affiliation with the warez groups, keeping in touch with those "friends" and being available for them in case any of them needed his help. In early August 2003, I-Che's "friends" faced a shortage of videogame supply, which would threaten the existence of the warez group (the warez scene ostracizes idle warez groups). Because the thought of his "friends'" potential loss burdened I-Che, he started to supply video games during this last semester of college. I-Che ceased doing so when he graduated from Washington University in December 2003.

After his December graduation, I-Che returned home to help his father with his burgeoning real estate career. With this change of location, I-Che was able to withdraw from active participation in the warez scene. He spent most of his time studying for his real estate licenses and learning the real estate and mortgage transaction business. After receiving his license and the necessary training, I-Che began working as a real estate agent and mortgage counselor for the Las Vegas Chinese community. Despite this transition from a student life to a working life, I-Che remained in contact with some of his "friends" in the warez community.

Highlighted by the fact that I-Che had withdrawn from active particpation in the warez scene, the events on April 21, 2004 stunned I-Che and forever changed his life. The FBI executed a search warrant at the Las Vegas home where he and his parents were living, looking

for evidence of I-Che's participation in the warez scene.  Although the search took approximately

two hours, to I-Che it was an eternity.  I-Che felt deeply his family's confusion, his mother's

terrified look, and his father's profound disappointment in him.  I-Che had brought his family

great shame.  I-Che knew that his criminal behavior was an affront to his family and their

immigration to the United States.

**Mr. Lai's Efforts to Redeem Himself**

### Mr. Lai Provided Extensive Cooperation To The Government In Connection With Its Investigation Of Others

As noted above, within months of the execution of the search warrant, I-Che began the

process – that continues to this date -- of doing all he could to make amends for his criminal conduct.

In June of 2004, Mr. Lai was extensively interviewed by the DOJ and law enforcement from the

District of Connecticut.  Before he pleaded guilty, he was providing DOJ with additional information

(though the undersigned counsel) in furtherance of DOJ's investigation of others.  In January of 2006,

I-Che was again extensively interviewed in Hartford in furtherance of the government's investigation

of others.  This was followed by I-Che traveling from Wisconsin to New Haven in March of 2004 to

be further interviewed in the government's continuing investigations.  I-Che offered to be of

assistance in any way, including being part of a public relations campaign to raise awareness of

internet piracy issues.  And while the Government does not need, in the near term, further cooperation

from Mr. Lai such that would justify seeking a postponement of the sentencing, Mr. Lai stands ready

to assist the Government in the future.

In sum, Mr. Lai has provided extensive cooperation to the government over substantial

period of time, and is willing to continue to do so in the future.  Mr. Lai understands that he has

provided the government with substantial useful information, notwithstanding the Government's

determination that the assistance provided does not yet reach the level of substantial assistance in the prosecution others such that a 5K1.1 motion would, in the government's judgment, be warranted. While the government is not at this time in a position to prosecute additional persons such that a 5K1.1 motion can be filed, the Court can, in fashioning an appropriate sentence in this matter, still consider the assistance provided by Mr. Lai to the Government, the length of time over which Mr. Lai has provided assistance to the Government, his efforts (including cross-country travel) in furtherance of his cooperation with the Government, his continuous willingness to cooperate, and his willingness to provide assistance to the Government in the future. While these activities may not be the basis for a downward departure within the "Sentencing Guidelines" factor contained in 3553(a)(4), the Court may consider this conduct in the broader factors found in section 3553(a).

The Second Circuit in <u>Fernandez</u> made it clear that cooperation with the Government that, in the Government's judgment, does not reach the level of a 5K1.1 motion should nonetheless be considered by the Court under other factors that Govern sentencing under 3553(a)(1). In this regard, the <u>Fernandez</u> Court specifically stated:

> We agree that in formulating a reasonable sentence a sentencing judge must consider "the history and characteristics of the defendant" within the meaning of 18 U.S.C. § 3553(a)(1), as well as the other factors enumerated in § 3553(a), and **should take under advisement any related arguments, including the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant** to U.S.S.G. § 5K1.1 (" non-5K cooperation"). **Section 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what " history and characteristics of the defendant" are relevant.** This sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation.

443 F.3d at 33. In this case, Mr. Lai urges the Court to consider under 3353(a)(1) his extensive efforts at cooperation as part of his history and characteristics, in that those

efforts provide strong evidences of both the remorse that Mr. Lai has felt and the rehabilitation that he has achieved.  Further, Mr. Lai urges the Court to consider his extensive efforts at cooperation under Section 3553(2)(B), since those efforts are evidence of the lack of a need for incarceration to provide specific deterrence, since they show that Mr. Lai has learned from his mistakes and will not repeat them in the future.  Similarly, Mr. Lai respectfully requests that the Court consider these cooperation efforts under Section 3553(2)(C), since these efforts at cooperation speak to the absence of a need to protect the public from further crimes of Mr. Lai.  See Fernandez, 443 F.3d at 33 n. 10 ("While Fernandez's counsel limited his argument regarding the relevance of cooperation to § 3553(a)(1), we note that cooperation may be relevant to other § 3553(a) factors as well.").

### University of Wisconsin Law School

In the fall of 2004, I-Che entered his first year of law school at the University of Wisconsin Law School.  Confronting the circumstances of his offense conduct impacted I-Che's ability to perform in that first year of law school.  As he went through the process of assisting the government, and pleading guilty to his offense, in conjunction with the process of maturing, I-Che began to be able to immerse himself in his studies at the Law School.  I-Che's performance in this his second year at Law School was substantially better than his first year -- I-Che's grade point average put him in the top 1% of the second year law students.  In his third year, while continuing to focus on his law studies, Mr. Lai also had the responsibility of being the director of the Evan A. Evans Constitutional Law Moot Court Competition, which was held in the spring semester.  As such, he was responsible for organizing all aspects of the competition and ensuring its successful completion.

With his background and love for debating, I-Che clearly excelled in Law School in the area of Moot Court. In his third year, I-Che was the Vice-President of the Moot Court Board, and, as noted, the Director of the Evan A. Evans Constitutional Law Moot Court Competition. I-Che also won the Mathys Memorial Appellate Advocacy Award. In his second year, I-Che had won First Place in the Omar Megahed Moot Court Competition. This followed his early Moot Court awards: Third Place Brief, Ruby R. Vale Interschool Corporate Moot Court Competition and Fifth Place Overall, Ruby R. Vale Interschool Corporate Moot Court Competition. In addition to Moot Court activities and achievements, I-Che was a Board Member of the *Wisconsin International Law Journal*.

Consistent with his desire to practice in the area of patents, I-Che achieved the Highest Grades in the following courses: Patent Law (A), Trademarks (A), Business Organizations I (A) and Evidence (A+). I-Che also received the Outstanding Third-Year Law Student Award from the Asian Pacific American Law Student Association / South Asian Law Student Association, of which he had been a member since starting law school. I-Che also received the University of Wisconsin Law School Dean's Academic Achievement Award and the State Bar of Wisconsin Academic Achievement Award in Evidence. To round things out, I-Che was also an Actor in Stuart's Law Revue, the Wisconsin University Law School Theatrical Society.

Not only did I-Che do well in Law School and in the Law School's Moot Court programs, I-Che also spent most of his free time helping various student organizations: practice judging first year members of the Black Law Student Association for their moot court tryouts, tutoring first year students on various subjects, and volunteering his time with the SPRITE program (a program designed to teach delinquent youth the skills necessary for successful reintegration into their home communities). With respect to his participation in the SPRITE program, I-Che wanted to share his past criminal behavior with troubled youths to encourage them to learn from their past

mistakes and start anew.  I-Che felt that, based on his past criminal conduct, he had a different perspective than the other volunteers and could pass on to these troubled youths what he had learned from his past and how he was determined to do all he could to become a productive and contributing member of society.

I-Che has now completed his study of Law at the University of Wisconsin and is studying to take the examination for the Bar of the State of California.


**IV. The Nature And Circumstances Of The Offense**

Mr. Lai previously submitted his Personal Statement to the Probation Office.  That statement provides substantial insight into the nature of circumstances of this defendant's offense conduct.  Critical among these circumstances are that Mr. Lai did not intend to harm anyone by his conduct, that the harm described by the government was not readily apparent to Mr. Lai; and that Mr. Lai did not engage in offense conduct in order to obtain financial gain.  It is respectfully submitted that these critical facts warrant this Court's careful consideration of "the nature and circumstances of the offense" under 18 U.S.C. § 3553(a)(1) in determining a just and reasonable sentence.

The information to which Mr. Lai pleaded guilty describes his warez activity as beginning in or about September of 2002.  At that point, I-Che was a young, 22 year old college student.  Viewing the world through the eyes of a college student, the harm that could be caused by his warez activity, which was again not done for profit, was not readily apparent to I-Che.  Having perceived his immersion into the on line community as stepping "into a limitless well of knowledge" and having found there the bonds of "friendship," I-Che "naively [and wrongly] viewed this kind of participation as essentially harmless and educational entertainment."  While

knowing that the materials were copyrighted, I-Che did not then see his conduct as causing harm. Thus, I-Che did not have the intent to harm that would justify the infliction of more strenuous punishment.

      To put I-Che's conduct in a temporal context, it had only been a few years earlier (in 1997) that Congress had even criminalized copyright infringement that occurred without a profit motive or the receipt of profits.[1]  The Department of Justice had not issued its first Report Of The Department of Justice's Task Force on Intellectual Property until October of 2004,[2] over three months after I-Che has begun his process of making amends for his offense by being debriefed at the Department of Justice in June of 2004.  The business and industry campaigns of today against on-line copyright infringement had not yet reached their current breadth and effectiveness.  While today every rented DVD starts with what amounts to a short movie/commercial explaining how copyright infringement is theft, there was no such widespread media campaign when I-Che got involved in warez.  Similarly, at any movie theatre today patrons see as part of the previews a public service short movie/commercial

---

[1]  Prior to 1997, the Copyright Act of 1976 did not criminalize copyright infringement without a profit motive or receipt of profits.  See United States v. Cross, 816 F.2d 297, 301 (7th Cir. 1987).  For example, in United States v. LaMacchia, 871 F. Supp. 535, 536 (D. Mass. 1994), the Government prosecuted a Massachusetts Institute of Technology student in relation to software piracy in circumstances where he did not have a pecuniary motive.  Because the Copyright Act did not permit this criminal prosecution, the Government prosecuted him under a wire fraud theory.  The Court dismissed the indictment, in essence holding that copyright infringement could only be prosecuted under the Copyright Act.  871 F. Supp. at 545.   It was only in response to this situation that Congress criminalized conduct such as I-Che's, when it expanded the definition of "financial gain" to include the "receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works."  Thus, in 1997, Congress for the first time criminalized copyright infringement in a situation where the infringer did not intend to profit off the infringement nor receive any profits from the infringement

[2]  The creation of The Department of Justice's Task Force on Intellectual Property was not announced until March 31, 2004.

dramatizing how downloading copyrighted materials is the equivalent of theft. There were no equivalent widespread dramatizations playing in our nation's movie theatres in 2002. Young and acting with very poor judgment, I-Che's awareness had not then been raised to the point that where he appreciated the harm that warez could cause, and certainly did not intend such harm.

Mr. Lai also did not engage in the offense conduct to obtain financial gain. If I-Che had been selling copyrighted materials, then it would have been clear to him that he was taking away sales from retailers of various copyrighted materials. But since people were obtaining online copies of copyright materials at no cost, it was not apparent to I-Che that there was a loss to a retailer and others on down the production line. Because someone would take a DVD or CD for free from the internet did not translate into knowledge that, if that DVD or CD were not available for free on the internet, that person who had downloaded it would have instead gone to a retailer and purchased that DVD or CD. Thus, the fact that I-Che did not engage in his offence conduct for profit shows that he did not have a greed motivation deserving of punishment, but also provides the context in which someone in I-Che's position might not appreciate the harm that could be done by the warez scene.

## V.    The Advisory Guidelines Calculation

### A. The Advisory Sentencing Guidelines Range

For the purpose of the Court's evaluation of the advisory sentencing guidelines under 3555(a)(4), the Presentence Report has adopted the stipulation between the Government and the defendant to the following application of the 2004 Sentencing Guidelines Manual:

The base offense level under U.S.S.G. § 2B5.3(a) is eight (8); fourteen (14) levels are added under U.S.S.G. §§ 2B5.3(b)(1) and 2B1.1(b)(1)(H) for a loss between $400,000 and $1,000,000; two (2) additional levels are added under U.S.S.G. § 2B5.3(b)(2) because the offense involved the

uploading of infringing items;  resulting in an adjusted offense level of twenty-four (24); three (3) levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility; resulting in a total offense level of twenty-one (21).  With no criminal history, and therefore Criminal History Category I, the range for imprisonment is 37 to 46 months and the fine range is $7,500 to $75,000.

**Within the "Sentencing Guidelines" Factor contained in 3553(a)(4), A Downward Departure for Mr. Lai is Warranted in this Case**

As this Court is well aware, the Sentencing Guidelines provide for departures below the applicable guidelines range where the Court "finds a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. §3553(b); U.S.S.G. §5K2.0.  Indeed, the Supreme Court has emphasized that our judicial tradition requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate … the crime and the punishment to ensue."  Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996).

"Exercise of the departure power in appropriate circumstances is an essential ingredient of the sentencing system."  United States v. Merritt, 988 F.2d 1298, 1306 (2d Cir.), *cert. denied,* 508 U.S. 961 (1993).  "The authority to depart provides a 'sensible flexibility' to insure that atypical cases are not shoe-horned into a Guidelines range that is formulated only for typical cases." United States v. Rogers, 972 F.2d 489, 493 (2d Cir. 1992).  Therefore, "[t]he District Court not only can, but must, consider … a departure when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest'."  United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995) (emphasis added).

"Unless departure is expressly forbidden by statute or Guidelines, *see*, *e.g.* USSG §§ 5H1.4, p.s., 5H1.10, p.s., it may be considered in any circumstances not adequately taken into account … by the [Sentencing] Commission." United States v. Cruz, 125 F.3d 74, 79 (2d Cir. 1997). The Second Circuit encourages sentencing judges to consider all possible bases for departures. See United States v. Core, 125 F.3d 74, 79 (2d Cir. 1997). Even a "discouraged factor" (such as family ties and responsibilities, U.S.S.G. §5H1.6) may justify a downward departure so long as that factor alone or in combination with others "makes the case different from the ordinary case." Koon v. United States, 116 S. Ct. at 2050. Furthermore, the Court may "downwardly depart when a number of factors, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the "heartland" cases covered by the guidelines'." United States v. Rioux, 97 F. 3d 648, 663 (2d Cir. 1996) (*quoting* U.S.S.G. §5K2.0 cmt.).

Mr. Lai respectfully submits that numerous factors are present to warrant this Court to depart downwardly from the offense level to a lower Total Offense Level. The grounds for downward departure are as follows:

**(1) Mr. Lai's extraordinary acceptance of responsibility;**

The Court has the authority to depart downward for exceptional acceptance of responsibility. United States v. Rogers, 972 F.2d 489 (2d Cir. 1992). In this case, Mr. Lai promptly responded to the Government's first contact, fully cooperated with the Government investigation, resolved to plead guilty to a felony in connection with his cooperation with the Government, provided assistance to the Government before his plea agreement and cooperation agreement were finalized and before the guilty plea was entered. Also, after the guilty plea,

continued to provide assistance where possible, including cross-country travel and offering to do whatever could be done to assist the government.

In addition, as noted above, I-Che participated in a program at the Wisconsin Law School designed to teach delinquent youth the skills necessary for successful reintegration into their home communities.  I-Che's participation specifically involved I-Che sharing his past criminal behavior with these troubled youths to encourage them to go down another path.

Letters submitted to this Court on behalf of I-Che also evidence his extraordinary degree of acceptance of responsibility.  For example, Melissa D. McNair, a fellow law student, wrote in part**:**

> *... I-Che asked if I voted ... I asked him if he voted and he told me he couldn't and explained why. He was so horribly sad. He commented that he never realized how much voting meant to him and how he would give anything to have that right back. I was shocked. But at the same time I was incredibly impressed with I-Che. **Unlike many students and adults for that matter, he accepted complete responsibility for his actions. He did not blame anyone else or make any excuses. He said what he did was wrong and that he would do anything to live the life that others [sic] students (like me) take for granted.***

(emphasis added).  In another example, Ruth Robart, Assistant Dean of Student and Academic Affairs at the University of Wisconsin Law School wrote, in part:

> *I have known Mr. Lai since early in the fall of 2004.  To his credit, he came to my office during the first weeks of the semester to disclose that he was then under investigation for federal offenses. He did so, despite ambiguities in our reporting requirements at the time that might have justified his withholding this information. I appreciate that he consistently kept me abreast of his legal situation.*

It is respectfully submitted that I-Che has accepted responsibility for his offense in an extraordinary manner, and that this warrants a downward departure within the "Sentencing Guidelines" Factor contained in 3553(a)(4).

**(2) Mr. Lai's extraordinary rehabilitation prior to imposition of sentence;**

A departure for extraordinary rehabilitation is permissible under the sentencing guidelines.  See United States v. Workman, 80 F.3d 688, 701-02 (2d Cir. 1996).  As has been described above, and without repeating the same, in the years since his offense, Mr. Lai has provided extensive cooperation to the government, has attended and graduated from law school, doing exceedingly well in his last two years of school, and has done all in his power to be a positive influence in his world.  I-Che has taken stock of the offense he committed, and learned from his mistake, has matured and has taken extraordinary steps to put himself in a position where he can be a very valuable, contributing member of society.

Again, letters on I-Che's behalf testify to this rehabilitation.  Isela C. Arellano, a fellow law student, in part wrote:

> While his involvement in the piracy scene should not be disregarded, much consideration should be given to the fact that when the events took place I-Che was very young and naïve. **The person I know today is not that person, but a person of morals, values, and regard for others and the law.**

(emphasis added).  The letter of Ms. Robart, I-Che's Assistant Dean at Law School, also speaks eloquently to I-Che's extraordinary rehabilitation:

> I write in support of I-Che Lai because I believe that his performance as a law student and his exceptional commitment to community service demonstrate that **Mr. Lai has learned from his egregious and unlawful conduct prior to law school.** While I do not condone or excuse his misconduct, I believe that Mr. Lai has consistently acted lawfully and responsibly during law school. **As he has become more and more engaged in his courses and community service activities, I have seen him grow into a person fully capable of handling the responsibilities of adulthood and of the legal profession.**

(emphasis added).

It is respectfully submitted that Mr. Lai's conduct since the time of his offense is powerful evidence of extraordinary rehabilitation, and that this warrants a downward departure within the "Sentencing Guidelines" Factor contained in 3553(a)(4).

**(3) The offense of conviction was aberrant behavior for Mr. Lai, in that it represents a marked deviation from an otherwise law-abiding life**

Under Section 5K2.20, the Court may depart downward if the offense conduct is aberrant behavior.  In the instant case, the offense of conviction was aberrant behavior for Mr. Lai, in that it represents a marked deviation from an otherwise law-abiding life.  Among other things, Mr. Lai had no criminal record, he acted without a motive for pecuniary gain and derived no pecuniary gain, he undertook significant efforts to mitigate the effects of his crime, he has had an excellent scholastic and employment history both before and after the offense.  It is respectfully submitted that, considering the totality of the circumstances, it is within the Court's discretion to depart based upon aberrant behavior.

Mr. Wayne Tanaka, the principal of I-Che's high school, wrote about what I-Che was like before he attended college and before he became involved in the warez scene.   Mr. Tanaka describes someone who was a bit different than some, but clearly a good person who was very giving to others.  Mr. Tanaka wrote:

> *I-Che and his friends were "nerdish, computer geeks" with a sense of humor but ready at any time to show others how to problem solve in any science, math or computer class...*
>
> *...who **volunteered hundred of hours in community clean-up projects, homeless shelter food lines, and he even helped to clean a charity store after thieves vandalized it…***
>
> ***He readily assisted anyone who needed help ranging from math problems to dating problems. If there was a problem to be solved, I-Che was the type of individual who. would see the problem as a challenge to his abilities.** Perhaps, it is this self assuredness and the desire to, assist others that contributed to his current predicament.*

(emphasis added).  Michele Wong, who went to high with I-Che and has known him for 10 years,

also gives a glimpse of pre-college I-Che:

> *Ever since the first day I met I-Che back in high school, I've always known him an [sic]*
> *amazing individual in so many aspects. He is a kind and caring person, a hard worker in*
> *many ways. He knew him to excel academically. Not only does I-Che never have*
> *malicious intent or motives, but he also regularly sacrifices himself for friends and*
> *family. He has a big enough heart to take care of those he barely even knows.*
> *……… his involvement in student government as Vice President of the school and*
> *member of various community service organizations for all four years of his high school*
> *career, such as Key Club and National Honor Society inspired me to do the same as he*
> *has done by taking an active role in giving back to the community.*

Similarly, Benny Yeh, who has known I-Che for 12 years, wrote glowingly about his experiences

with I-Che:

> *I have known I-Che for 12 years ever since high school and I have never seen him do any*
> *wrong deeds to his family, friends, or community*
>
> *…….. I always see him as a person with a sincere heart, always giving to his family,*
> *friends, school, and community and asks nothing back.*

     As noted above, since his offense conduct, I-Che has returned to his law abiding life,

more determined that ever to be a positive, contributing member of society.  Letters from law

students who have only know I-Che after his offense conduct, also show how aberrant his warez

conduct was.  One fellow student, Ms. Arellano wrote about I-Che as she came to know him at

law school:

> *During law school I-Che was involved in many outreach efforts mentoring fellow*
> *students, as well as reaching out to undergraduate and high school students interested*
> *in a career in the law.  I-Che was also an active member and leader of many student*
> *groups, leading study sessions and selflessly volunteering his time to others. While I*
> *never thought that I-Che set out to be the most notable person in law school, he most*
> *definitely was. Everyone knew him to be the outgoing, genuine guy who went out of his*
> *way to give advice, lend and ear, and be a friend.*

Writing of the I-Che she has observed at her law school for the last three years, Dean Robarts wrote in part:

> *While I do not condone or excuse his misconduct,* **I believe that Mr. Lai has consistently acted lawfully and responsibly during law school…..**
>
> **I have known Mr. Lai, as a student leader, always positive in attitude and always ready to help others.**

(emphasis added).

The fact that those who have know I-Che well are shocked by his offense conduct further shows the aberrant nature of that conduct.

> Isela C. Arellano wrote:   *"I write this letter of support on behalf of I-Che Lai* **still in utter disbelief of the circumstances at hand.  The reason for my incredulity is that the person depicted in the software piracy scene is not the person I have come to know and appreciate over the past three years."**

> Melissa D. McNair wrote**:**   *"… I-Che asked if I voted … I asked him if he voted and he told me he couldn't and explained why. He was so horribly sad. He commented that he never realized how much voting meant to him and how he would give anything to have that right back.* **I was shocked***.*

> Benny Yeh wrote  *"…when I-Che told me that the FBI had searched his house,* **I was in disbelief.  It was inconceivable that I-Che would break the law.**  *I have known I-Che for 12 years ever since high school and I have never seen him do any wrong deeds to his family, friends, or community."*

> Michelle Wong who has known I-Che for ten years upon learning of I-Che's situation "… **I was very stunned and to this day, it seems surreal that he was involved in it."**

It is respectfully submitted that Mr. Lai's conduct both before sand since his offense conduct demonstrates that his offense was aberrant conduct in an otherwise law abiding life, and that this warrants a downward departure within the "Sentencing Guidelines" Factor contained in §3553(a)(4).

**(4) The absence of a pecuniary gain and motive for pecuniary gain places this offense outside the heartland;**

It is respectfully submitted that the absence of a pecuniary gain and the motive for pecuniary gain places this offense outside the heartland of such copyright infringement cases. Cf. United States v. Brennick, 134 F.3d 10, 13-14 (1st Cir. 1998 (discussing "heartland" of tax cases). The defendant respectfully submits that I-Che's motivation in this case presents a situation "sufficient to take the case out of the Guideline's heartland" of criminal offenses within the scope of § 2B5.3. See Koon, 518 U.S. at 96. Section 2B5.3 covers cases of criminal infringement where the offender is **selling** copies of copyrighted works, where the offender is **selling** goods or services with counterfeit trademarks, such that **consumers are purchasing** what they believe to be genuine articles, where the offender steals trade secrets and **sells those secrets** to the highest bidder or uses those trade secrets in the offenders own business to generate **profit for the offender**, and where the **offender is making profit** from the offender's use of patented items. In contrast, I-Che's case did not involve him selling anything, making any profit, or attempting to make any profit. Nor did I-Che case involve consumers purchasing counterfeit products. It is only because I-Che's offense involved his personal use of movies and games that were available to him as part of the warez scene that his case, under the definition of the guidelines, is one "committed for commercial advantage or private financial gain." While I-Che had the personal use of movies of games, and this is defined as "private financial gain" under the guidelines, this should not be confused with an offender who attempted to make profit on copyrighted materials, or with offenders who attempted to make profit based on the other types of conduct that are within the heartland of § 2B5.3. A heartland § 2B5.3 offense is one the offender commits with the motivation of greed and wealth acquisition. See generally United States v. Livoti, 196 F.3d

322, 328-29 (2d Cir. 1999) ("heartland" analysis).  See also United States v. Sidhom, 142 F. Supp. 2d 150, 154-161 (D. Mass. 2001) ("heartland" analysis for money laundering).  Greed and profit were not Mr. Lai's motivation.  I-Che did not derive profit from his wrongful conduct.

It is respectfully submitted that these circumstances take Mr. Lai's conduct outside the "heartland" § 2B5.3 offenses and that that this warrants a downward departure within the "Sentencing Guidelines" Factor contained in 3553(a)(4).

**(5) The loss calculation under the guidelines overstates the seriousness of the offense, because Mr. Lai did not intend to cause loss and the loss was not apparent at the time of the conduct.**

As explained above, in the circumstances where I-Che's warez conduct was not undertaken for profit, and given the time frame in which I-Che engaged in such conduct, I-Che did not intend to cause the loss calculation represented by the amount of infringement, since that loss was not readily apparent to him.  While such loss would be apparent to someone who was selling the infringing items, the seller would be aware of the loss and indeed intend the loss, and, accordingly, the loss would adequately reflect the seriousness of the offense.  However, for I-Che, who was not selling the infringing items and who did not intend to cause loss and to whom the loss was not apparent, the loss calculations overstates the seriousness of his offense.

It is respectfully submitted that these circumstances take Mr. Lai's conduct outside the "heartland" with respect to the infringement vale/loss calculation and that that this warrants a downward departure within the "Sentencing Guidelines" Factor contained in 3553(a)(4).

**(6) Mr. Lai's exceptional scholastic history;**

Throughout this memorandum, the exceptional scholastic achievements of I-Che from High School through Law School have been addressed.  Particularly given that I-Che began in

English as a second language classes, his achievements, concentrated in the areas of science and mathematics, are truly extraordinary.  It is respectfully submitted that these circumstances warrants the court's consideration and a downward departure within the "Sentencing Guidelines" Factor contained in § 3553(a)(4).

**(7) Mr. Lai's exceptional degree of remorse;**

Mr. Lai's offense has brought great shame to himself and to his family.  In his culture, this shame is especially deeply felt.  I-Che has extraordinary remorse for what he has done and the impact that his conduct has had on his family.

In his statement to Probation, I Che stated:

> Having gained in maturity since my days in the warez scene and since the raid, I can now **unequivocally express my deep and sincere regret for my actions and the effects that those actions have had on others, particularly on my family.**  I can also definitively declare that I have learned from my criminal behavior and that I will never make such a mistake again.

Further, the letters submitted in support of I-Che also reflect that those around I-Che have perceived his great remorse and shame and the impact on his family of his offense conduct. In this regard:

Molly Gena, a fellow law student, wrote:

> *During the first semester of law school, I-Che told me about his legal situation. He was hesitant and did not want to tell many people, as he did not want other students to lose respect for him. He told me in confidence, and was upfront and honest about his circumstances. **He was clearly ashamed of his actions, and expressed his remorse for what he had done. He talked to me about his family and how this had already caused a great deal of pain to his parents. He was worried, most of all, about how much more pain they would have to endure.** I was surprised and sorry to learn of his situation, but I know that he has learned from his mistakes.*

Mr. Tanaka, I-Che's high school principal, stated:

> I know I-Che is **remorseful and embarrassed that his family will also carry the "shame" of his actions.**

Isela C. Arellano, also a fellow law student, wrote:

> *.. I received an email from I-Che discussing his predicament and asking me to write a letter on his behalf. **What was obvious in that email was his embarrassment, shame, regret,** and desire to not want to strain our friendship if I were to feel uncomfortable in becoming involved.*

Claudia Catotoa, a law student, wrote

> Because of his sense of humor and his easygoing spirit, it was a shock when he told me about his legal situation.  To be honest, I would never have expected I-Che to be involved in such a situation.  **He told me about his situation about a year ago and expressed deep remorse for what he had done.**"

Benny Yeh, who has know I-Che for over a decade, wrote:

> *I found out the severity of his case when I received a letter from I-Che. After reading about his legal situation, I was shocked at what he has to face as he awaits for his sentence in June. **I felt his deep regret and remorse with each and every word that he wrote.** I thought I would never see him in such a situation because I always see him as a person with a sincere heart, always giving to his family, friends, school, and community and asks nothing back.*

It is respectfully submitted that the exceptional remorse and shame in this case is a basis

upon which the Court can depart downward within the "Sentencing Guidelines" Factor

contained in § 3553(a)(4).

**(8) There exists under 5K2.0, a combination of characteristics and circumstances, even if the Court determines that none of them are individually sufficient, such that the combination thereof takes the case out of the heartland and warrants a downward departure.**

Mr. Lai respectfully submits, based on the circumstances enumerated above, that there

exists under 5K2.0, a combination of characteristics and circumstances, even if the Court

determines that none of them are individually sufficient, such that the combination thereof takes the case out of the heartland and warrants a downward departure.  When considered together, the number and variety of extraordinary circumstances present in this case presents a situation "sufficient to take the case out of the Guideline's heartland."  See Koon, 518 U.S. at 96.  This is so even if this Court were to determine that no one of the factors present here would, alone, render the case extraordinary.  See United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996) ("[D]istrict court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the "heartland" cases covered by the Guidelines.'") (citation omitted); see also United States v. Caruso, 814 F. Supp. 382, 384 (S.D.N.Y. 1993) ("[A]lthough the defendant's age, military service, medical problems, good employment record, and likely future compliance with the law might not individually justify departure, the totality of these circumstances represent ground for downward departure here, where, 'several characteristics, in combination, were not adequately taken into account by the Sentencing Commission in formulating the guidelines.'") (quotations and citations omitted).

     While it is respectfully submitted that any one of the factors enumerated above should itself provide sufficient grounds for the Court to fashion an appropriate downward departure, in combination they provide more than ample basis for this Court to grant Mr. Lai a downward departure within the "Sentencing Guidelines" Factor contained in § 3553(a)(4).[3]

---

[3] In addition, if the Court concludes that some of the circumstances do not warrant a downward departure within the "Sentencing Guidelines" Factor contained in § 3553(a)(4), it is respectfully submitted that the Court should consider them under the remainder of the factors set forth in §3553(a) in determining the appropriate sentence in this matter.

## VI. A Sentence Of Probation Would Sufficiently Satisfy The Purposes Of Sentencing

Based on all of the circumstances described herein, it is respectfully submitted that a sentence of probation in this matter, together with substantial community service, would be a sentence that is sufficient, but not greater than necessary, to achieve just punishment in this instance. This federal felony conviction, and a sentence of substantial term of probation mandating significant community service serves well the need to deter others from committing a similar offense. Given that this offense was not done with the intent to inflict harm or for the purpose of making profit, a stiffer sentence is not required for deterrence purposes. Nor is a stiffer sentence required to reflect the seriousness of this particular offense, or to promote respect for the law.

Moreover, a stiffer sentence is not needed to provide just punishment for Mr. Lai for his offense conduct. Through causing such shame and pain to his family, and confronting that fact over the past three years, I-Che has inflicted significant punishment on himself. And while I-Che has gone through law school and excelled in his rehabilitation efforts, his conviction may also result in additional punishment in the form of the collateral consequence of keeping him from becoming admitted to the bar and practicing law. In the context of this prospect, it is respectfully submitted that a sentence that includes incarceration would result in a sentence that is greater than necessary to achieve just punishment in this particular case.[4]

Furthermore, there is no risk in this case that Mr. Lai will re-offend. Mr. Lai committed this offense through the exercise of poor judgment as a college student. Mr.

---

[4] As noted in the Presentence report, this is not a case where restitution is sought. And, given Mr. Lai's educational history, this is also not a case where the need for education or vocational training or other correctional treatment seems applicable.

Lai has matured and his judgment is much better than it was at the time of his offense conduct.  Far from being a risk to society, Mr. Lai has taken an entirely different path, one headed toward the goal of being a productive, law-abiding member of society.  This is not the type of individual whose removal from society is a necessary safeguard to protect others against future harm.

A recent publication by the United Stated Probation and Pretrial Services describes community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair – a `win-win' proposition for everyone involved."  In selecting an appropriate candidate to perform community service, U.S. Probation & Pretrial Services recommends:

> ...Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service...Courts look for offenders with personal and social stability, who are willing and motivated, and who have no history of violence.

Clearly, I-Che is a good candidate for community service: he is a first-time offender; he has no history of violence; and is highly motivated to aid his community.

In a similar vein, because Mr. Lai has no prior criminal convictions or arrests, and therefore zero total criminal history points, Mr. Lai falls into the group The United States Sentencing Commission calls the "true" first offender.  *Recidivism and the First Offender*, U.S.S.G, May, 2004.  Looking at that very large group, the Sentencing Commission stated:

> From both culpability and recidivism risk perspectives, group A offenders, with no prior arrests, most strongly meet the conceptual definition of the first offender category. Offenders in the group A have no recorded contact with the criminal justice system prior to their instant federal offense.  Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are least likely to re-offend.

Mr. Lai's process of maturing into a law-abiding productive member of society, and his resolve to continue to be so, is evidenced by his admission of guilt and undertaking to repair damage done by cooperating with Government.  It is further evidenced by his volunteer work with the SPRITE program, which, as outlined previously, is a program designed to teach delinquent youth the skills necessary for successful community reintegration.  Seeking out this opportunity to interact with troubled youths, to share his story and relate consequences for engaging in criminal behavior, even if it is something peers may be doing and was perceived as harmless fun, demonstrates Mr. Lai's commitment to not only living a law abiding life himself, by also encouraging others at risk to make the same commitment.  Through this action, I-Che tried to help others, and convince them, through the error of his ways, to chooses a more direct path to maturity.

Lastly, the Probation Officer who prepared the report in this case, after consideration of all that he learned, concluded that Mr. Lai is not a threat to the public for future criminal behavior.  Indeed, U.S. Probation Officer Rothi, concluded his report by stating:

> With the support of his immediate family members, the defendant is capable of leading a law-abiding life-style.  Given the defendant's serious remorse for becoming involved in the instant offense, it is unlikely that Mr. Lai will re-offend in the future.

**Conclusion**

Based on all of the above, we respectfully ask the Court to consider imposing a sentencing on I-Che Lai to a sentence of probation with a a substantial period of

community service as part of his sentence, and whatever conditions of probation the Court deems warranted in this matter.

Respectfully submitted,

I-CHE LAI

By: Stephen V .Manning
Stephen V. Manning
O'BRIEN, TANSKI & YOUNG, LLP
CityPlace II
Hartford, CT 06103-3402
Phone: (860) 525-2700
Fax:    (860) 247-7861
svm@otylaw.com
Federal Bar # ct07224

## CERTIFICATE OF SERVICE

This is to certify that on June 14, 2007, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

  Stephen V. Manning
Stephen V. Manning
O'BRIEN, TANSKI & YOUNG, LLP